Consolidated with 25-1517 from the District of North Dakota, United States v. Cameron Smith. All right. Very well. Mr. Chapman, we'll hear from you first. Good morning. Good morning, Your Honor. May it please the Court, Mr. O'Connick. Cameron Smith was sentenced as if he was a murderer. The sentencing in this case was both procedurally flawed and substantively unreasonable. There is no justification for a 300-month sentence for vandalizing two small electrical substations. In fact, at the separate sentencing hearing, there was no evidence presented by the United States of America that any civilian population was even impacted by the short power outage of the Epping Wheelock, North Dakota station. And we know for sure there was no civilian impacted by the South Dakota electrical station because that only served a pipeline. The Epping Wheelock, North Dakota station was a very rural area. It's in the middle of the Bakken oil fields. The substation was erected, according to their testimony, at sentencing primarily to serve oil wells in the area. Looking at the map, you can see that this electrical substation is in the middle of probably 100 oil wells within a 10-mile radius, along with multiple multi-rig platforms for drilling. There was some testimony that the people of Epping may have lost power for a short period of time. Epping is a very, very small city in North Dakota. But there was no evidence that they were actually impacted from a very short power outage from the Epping Wheelock station. In fact, the evidence only showed that even the Epping Wheelock station primarily just served the pipelines and the oil fields. So it was a substantive mistake and a procedural error for the judge to conclude that the Note 4 departure provisions with respect to the terrorism enhancements would even apply to this situation. But I don't, excuse me, I mean, Note 4 doesn't require the sort of impact you're talking about, does it? I mean, on its face. In other words, I get your point that the power interruptions were not widespread or broad or maybe nonexistent in some cases. But I mean, my recollection is that the guideline talks about intimidating and coercing. And I think that's what the district court found here. I mean, why isn't there enough in the record here? You know, was there evidence of him spray painting? Was he spray painting? I mean, he was involved in, you know, we're generally aware of the situation here. This was a widely known sort of undertaking by activists and a response by the state and by the, you know, energy companies. Why specifically isn't that sort enough under the guideline? Because it has to be proven that the defendant had the intent to intimidate or coerce a civilian population. It isn't enough just to look at the final result, the whole point of the domestic terrorism. What's the point of the spray painting? Well, the spray painting, Your Honor, there was no civilian that even saw the spray painting. But we're talking about intent. You said it was about intent. What was his intent in spray painting and why couldn't judge or the district court rely on that? And maybe my recollection of the facts are wrong. If that's so, please let me know. But the small area of spray painting was like a symbol, DAPL, I believe it was. But the point being, Your Honor, that they have to present proof that the criminal defendant intended to intimidate and coerce a civilian population, not a private business. So Cameron's intent was global warming. And so if somebody holds out a sign that says, stop global warming, I would argue that that's not criminal intent to rise to the level of domestic terrorism. Similarly, if somebody paints rocks, DAPL, that does not rise to the level of domestic terrorism. Holding an ideology does not rise. But if you shoot a high caliber gun into an electrical facility for the purpose of influencing the population for environmental causes, doesn't that get there? I don't believe so, Your Honor, because we're talking about a privately owned entity. So in this case, Montrell Williams Electric Company owned the Epping Wheelock substation and a different private entity owned the South Dakota station that fed only the pipeline. But isn't it a fair inference for the district court to have made that his intent was to influence a broader audience than that one entity? One of the problems that we do have with the case, Your Honor, honestly, is that it's not defined any place. So the intimidation or coercion of a civilian population is no place defined in the federal sentencing guidelines manuals. And so the courts have been looking at it. And coincidentally, probably the most recent and influential case we have is the Mangione case out of New York City, where recently that court held that as unfortunate a situation as it was. But the murdering of an insurance executive does not rise to the level of having the requisite political ideology to apply for this domestic terrorism departure or the full adjustment. And that's the best example I have for you, Your Honor, is that it's not defined. And so the courts and litigants are trying to figure out, well, what exactly are we talking about with this domestic terrorism note for adjustment? And what do you have to prove? And everything that I've read in the case law is you have to prove that there was an intent to influence and coerce a civilian population. I can give you a better example of what might be closer. If somebody... Well, let me ask you this. Didn't your client say he was just trying to bring attention to stop the climate change disaster from happening? Correct. To a private entity, the South Dakota private entity that serviced only the pipeline. That's exactly what he said? Is that what he said or is that your spin on what he said? Because the quote I have is, I was trying to bring attention to stop this disaster from happening. Global warming disaster, Your Honor. Yeah. And so my understanding, Your Honor, is that by him shooting up the South Dakota station that fed just the oil pipeline, that that would impact that oil company and stop the oil from flowing. And then by shooting the Epping Wheelock station, that would stop the flow of those pipelines and those oil wells that directly were linked to that electrical substation. Maybe. Maybe. But why use the phrasing, quote, bring attention to, rather than stop the flow? Well, Your Honor, because... Or at least isn't it a fair inference for the district court to have made he had a broader audience than just the victim here? Well, the facts demonstrate in the case, Your Honor, that these two very rural electrical substations, the one in South Dakota, the one in Epping Wheelock, extremely rural. There was no threat at all to a civilian population, either getting hit by a bullet or nothing like that. It was all very isolated and very rural. And that's what he wanted. He did not want to hurt anybody. He did not want to coerce anybody. It was simply oil pipeline and oil infrastructure. Okay. But isn't it likely that shooting at something like that is going to result in press coverage and get attention of the public generally for his cause? I can take your argument, Your Honor, at face value for that. But the point being that if the civilian reads in the newspaper that somebody shot the substation, I don't think that brings intimidation or coercion to a civilian population. Now, it may bring to the electrical substation the idea that, hey, we need more security. But when it looks at the civilian population, intimidation, coercion, which is required by the federal guidelines, it doesn't exist in this case. And at the sentencing hearing, they really did not present any evidence of coercion of the civilian population. It's simply the privately owned substations that were involved. The United States of America... Has the Sentencing Commission done anything with this Note 4? My understanding is that there is no longer a Note 4. And perhaps Mr. O'Connick can correct me on that when he stands up here, Your Honor. But the Note 4, we believe, Your Honor, and argued in our brief, that was actually ultra vires because when Congress asked us... What did the commission do? What did they say when they removed Note 4? I think anymore we just deal with standard departures, Your Honor. And I don't know exactly what they said when they... And I believe that Note 4 has been removed, Your Honor. With respect to the sentencing issue, again, the judge on multiple occasions during the sentencing hearing asked the United States of America, well, isn't this really against the government? Because the pipelines is infrastructure that serves the oil industry, so really isn't this acting out against the government because the government controls oil policy. And United States of America breached our plea agreement in the response because the prosecutor pretty much agreed with the judge. And then the ultimate sentence to prove that that breach caused this procedurally and substantively unreasonable sentence, the judge sentenced my client to 300 months, which is 150 months on the North Dakota charge and 150 months on the South Dakota charge, and ran them consecutively. Now just out of coincidence, if the full terrorism adjustment, the horizontal adjustment going from Category 1 to Category 6 applied, the sentence would have been in that 300-month range. So I think what the judge actually did, he didn't like the plea agreement as reached. And instead of just rejecting it, which we'd have been much better off with, he sentenced my client as if the full terrorism adjustment applied, as if he set off some big bomb or something and harmed people. That's why I say this 300-month sentence is what murderers get in the guidelines. It is a 488% increase over the 41 to 51-month total offense level. So Cameron had no prior convictions of anything. Yes, he was in the United States of America illegally and shot up these two substations. Vandalism, that amounts to 41 to 51 months total offense level. He got a 488% increase with this 150 times 2. Do you remember, what was the government's request at sentencing? I don't remember. I believe it was 150 months. I think the government was just as shocked as us when we received this consecutive sentence of 150 times 2. So the government favored the 12-level departure but did not urge consecutive sentencing for the two counts? That's correct, Your Honor. And the Note 4 12-level potential departure, it doesn't have to be 12 levels.  It can be any place from 1 to 12. Where did the 12 levels come from? The Note 4 basically just says it can be up to 12. And so he got it twice. So Cameron, in his sentence that he got from the judge, he got that 12-level Note 4 adjustment twice, which is what resulted in this 150 times 2 consecutive sentence, 300 months. It's a life sentence for a 54-year-old man. I see I'm going into my rebuttal time. So I would like to stop unless you have any immediate questions. Well, I see. The 12 levels is what you get if 3A1.4 applies, the guideline itself applies. And you're saying the departure or the footnote, the application note, somehow refers to a departure up to that amount? Yeah, so if the full terrorism adjustment applies, you move Cameron from a Category 1 to a Category 6 on the sentencing scale. No, you increase by 12 levels if 3A1.4 applies. You don't move criminal history categories. Well, if the full terrorism adjustment applies, you go from Category 1 to Category 6, but I don't understand why he's Oh, I see. You're saying under Sub B. Yeah. Yeah, it's a Note 4 adjustment. So only you go off the total offense level going upwards vertically, not horizontally over the category scale, Your Honor. But Cameron got that twice. What did the judge say about why consecutive sentences were warranted? Well, in his comments, Your Honor, he specifically called out the alienage status of Cameron Smith. As a reason for consecutive sentences? He didn't specifically say that, but when he was talking about the sentence As an aggravating factor, in his view? Yeah, we're arguing in our brief that the judge used unconstitutionally Cameron's alienage status. He's a Canadian citizen. As an unapproved factor, an unconstitutional factor, which was another reason for this unreasonable sentence, Your Honor. You may reserve rebuttal as long as it's really for rebuttal. We don't want you to start arguing new points. I won't, Your Honor. I promise. Very well. Thank you. Mr. O'Connick, we'll hear from you. May it please the Court, opposing counsel, Mr. Chapman. Good morning. My name is Jonathan O'Connick, and I'm an assistant United States attorney with the District of North Dakota. In this case, I'd first like to respond to your question, Judge Colleton, about the application 3A1.4. The ultimate issue in the plea agreement and that sentencing was whether or not Note 4 would apply, and Note 4 is the kind of compromise of what the Sentencing Commission had come down to when it comes to terrorism. The fair application of 3A1.4 adds plus 12 and raises a person's criminal history category to 6. The application Note 4 was a situation where the court cannot raise criminal history but could increase up to 12 levels, the difference being the full 3A1.4 deals with a departure for conduct against the government in retaliation for government conduct, and the Note, 3A1.4 Note 4, deals with intent to coerce or intimidate a civilian population. And as the Court has stated on November 1st of 2025, the application for Note was removed, as were most of the departures. Actually, 3A1.4 and, I believe, 5K1.1 are still the departures that are remaining in the guidelines, but Note 4 has been removed. However, ultimately, a debate. What did the Commission say about that? Did they say something specific about that Note? I don't know for sure, Your Honor. I believe it was an intent to remove departures because variances had been more common than departures. I don't believe it was anything specific to Note, application Note 4. I think it was just a general purpose was to remove departures since they were an anachronism of a time pre-Booker. And one of the things I wanted to point out right off the bat, I suppose, is that this was two separate instances. The facts in this case are very important to how the sentence came down. You had an attack in South Dakota that occurred in July of 2022 where Mr. Smith used a high-powered rifle, traveled likely from Oregon to South Dakota, used this .450 Bushmaster rifle to shoot at the Keystone Pipeline substation that powered energy for that substation, and it went out without power for five days. Ten months later, he traveled again from Oregon to North Dakota. This time he targeted the Wheelock substation and shot it again at least 20 times with a high-powered .450 Bushmaster rifle. In both cases, the spray paint that was listed was Extinction Rebellion, Judge Kobes. The Extinction Rebellion was an environmental activist group that was trying to prevent climate change. And Mr. Smith's computer that was seized pursuant to a search warrant, on his computer there were numerous things that demonstrated his motive to promote environmental change. And by going, as the district court stated in sentencing, he said it's pretty coercive to use a .450 Bushmaster rifle on two separate substations and then, you know, to have climate change be, to resist climate change. You could have written a letter. You could have done these things. Is it right that the government was asking for 150 months? And I believe they were asking for the high end of that guideline range. I think it was either 151 or 188 months. Okay. So the sentence doubled. Is that due to the consecutive nature of the sentences? And if so, what was the articulated basis for running these consecutive? Yes, sir. And I think that's a very great point. When my esteemed colleague mentioned this was a 488 percent increase, I believe that's a bit misleading because the guideline range initially would have been 41 to 51 months for somebody convicted of destruction of an energy facility. The contemplated plea agreement was that the United States would ask for the note for enhancement. And that would raise the guideline range to 151 to a 188. And so our recommendation would be that group. The district court imposed consecutive sentences, 150 months on the South Dakota count, 150 months on the North Dakota count. And the basis the court did that was for several reasons. The first was the aggravating factor. The judge did not sentence Mr. Smith based upon his Canadian national origin, as this court has held in Lopez. Being an illegal alien coming into the country and committing crimes, being an illegal alien coming into the country and committing crimes, that can be determined for under 3553A as an aggravating factor. But I think what's really important here is the district court focused on how the intent. The defendant had this communique on his laptop where in 2018 it had been auto-saved, at least on his computer, where it had a manifesto of sorts describing how you need to destroy energy facilities. We need to prevent climate change. And one of the more important things is that that document has talked about prior actions of successful operations where people had disabled the substation or energy facility, the key components. And I think one of the more important things that came up was that at sentencing the defendants brought up jail calls that the defendant had made to somebody who I believe was in the media. And it was asking, has the news heard anything about this? And the judge had stated in sentencing, he says, the recordings prove he was very interested in hearing whether he made the news after committing the attack. Using a high-powered firearm to disable an energy facility by shooting it multiple times is intimidating conduct. The defendant's own testimony indicates he believed his prior lawful conduct was insufficient to attract attention, and therefore predetermined action was necessary. This was all done in the name of an extremist group called Extinction Rebellion with which Mr. Smith had apparently associated himself with. And that Extinction Rebellion, in addition to this communique, there were banners in — What were you reading from there? This, I believe, is the district court statements from the sentencing transcript at pages 56 to 57. Why do you say it was misleading to say it was a 588 percent increase? I shouldn't say — If you start at 41 to 51 and you get to 300 — Yes, Your Honor. All you have to do is do the math. What's misleading? Perhaps misleading was a — It's not that much of an increase over what the government wanted, but that's not what he was saying. I appreciate that. And maybe that was a poor choice of words. I think the better way to say it is there was the guideline range and then there was the post-departure guideline range that the United States was recommending. So the guideline range would have been 41 to 51 months. I understood that. I'm just saying he was saying what the increase was over the advisory guideline range. Correct. That was accurately stated. Yes, sir. And I appreciate that. And I wasn't trying to state anything about — What was the government's position on consecutive sentencing? We wanted concurrent sentences. That's what we had recommended. What was the reason for that recommendation? We believed that the defendant had taken responsibility under Rule 20 and decided, you know what, he's going to plead guilty to two counts instead of it being both a South Dakota charge and a North Dakota charge. He'd wrap it up. And so that was the benefit of the bargain is we would recommend concurrent sentences. And have to prosecute in two different venues, you mean? Yes, sir. And I think, you know, one of the important — Was that view presented to the court? Yes, sir. And we put it — In the plea agreement itself? In the plea agreement itself, we specifically state in paragraph — let's see, it is paragraph 8. What is that? Yeah, paragraph 11 describes kind of what the anticipated sentencing guidelines the United States and the defendant would agree upon. And then we describe how in paragraph 15 of the plea agreement, the amended plea agreement, that we would advocate for what is stated in paragraphs 11 and 13. So it was clear that we would be advocating the United States would be for this post-departure application note for 151 months, 188 guideline range. And the United States did not breach the plea agreement. Ultimately, what ended up happening, and it was at the evidentiary hearing, the United And there is no requirement that it actually has to have that effect. It just has to be his intent. And one of the things the Court had asked in a colloquy of my colleague was whether or not this could be a government conduct, because it's private businesses, there's a map overlay with the Native American tribes. And the United States acknowledged that that could have been something that the Court could have considered, but that it was not appropriate, given that the United States had looked at it as civilian customers and civilian private businesses. And ultimately, in our plea agreement, when this was raised, I believe, in a filing or in the sentencing memorandum, when this was raised in a filing, the United States specifically said, we are not asking for the full terrorism departure. And so the idea that this was in some way like a wink and a nod, that we were telegraphing to the district court that we wanted the full application, that is not true. What we were arguing is that we believe that this is targeting civilian-owned companies and civilian customers. And when we cited the Resnicek case, there's not a lot of case law on 3A1.4, the departure, and even less on Application Note 4. So the United States kind of found the gamut of sentences that went, I believe, ranging from 18 months to 200 and some months, and we put that before the Court. And Resnicek, which is an Eighth Circuit case that dealt with a defendant asking whether or not the terrorism departure, the full departure, should apply and saying that it was actually against a civilian company, so it wouldn't, we were putting that in to demonstrate our intent that the Court not find the departure, full departure applied, which would have raised his guideline range significantly to 200 and some months because, again, this wasn't a wink and a nod to the district court. The district court did not apply the full departure. He applied Note, Application Note 4, which did not increase the defendant's criminal history category to 6. What he did is, I believe, determined that these were two separate crimes, separated by 10 months. And in each case, the defendant had a very specific intent. He was here illegally in the country for approximately four years, decided to, on two separate occasions, travel to South Dakota and then North Dakota, the same pattern with a large caliber rifle, and then using, in both cases, Extinction Rebellion signage, and I believe no DAPL in one case and Siouxland in another, all to promote the climate change agenda and to coerce a civilian population to change. And our argument is both twofold that — Let me, let me ask you.  What exactly is the civilian population he intended to intimidate or coerce? Yes. That is an excellent question. The United States has two — the first one would be the customers of the actual power plant. I believe they were out of power for about four and a half hours. That's in the evidentiary transcript. I believe that's Mr. Hoffman or Steve Peterson. And then the other would be the actual companies themselves could be considered a civilian population. And I understand the Mangione case, that there was a similar terrorism statute that the State of New York had kind of adopted. But what's different about the cases that the defense, or Mr. Smith, has cited in his briefers, those were actions that were either normal street crime or in Mangione against one individual. He's shooting a person for a personal agenda against the CEO of healthcare. This writ large, the general population, I'm not sure you can say his intent was to coerce or intimidate. I think his intent was to persuade, maybe, or influence. Do you think that applies to the customers, the coerce or intimidate applies to the customers who lost electricity? I do, sir. And not just the customers, but also the oil pipeline. I believe the civilian population can be defined broadly for several reasons, and mainly because if you look at — Do we know, at these facilities, were there a certain number of employees physically present? No. I believe that nobody was present at the time that these shootings occurred. And I believe that actually, it's in the record, the defendant actually went out at night when nobody was there. But I think the intent is really in the phone calls that he made afterwards. It's really not so much who was there and what was done. It was what did he want to happen. He wanted this to make the news. He wanted this to make the news so people, whether they be civilians in the western North Dakota area or the South Dakota area, hey, stop climate change. Otherwise, he would not have included the spray paint. And the spray paint is directly linked, that Extinction Rebellion sign, to his computer showing — So what does that mean, to coerce the public to do what? To stop using carbon fuels, to go to your government and rise up, to shut down the power plants in the United States, to train — to become more green. His intent is both specific and general. I believe it's specific to the people in those areas that are directly — How is that an intent or a motive to intimidate, of course, the population as opposed to a motive to encourage them to rise up and do something vis-a-vis their own government or their own private industries? I think that's a good point. I would say that it's kind of on a knife's edge of where his conduct would fall into. I would say his intent, if you look at his intent from his computer and everything that was found, his intent was to make sure that people — that climate — that he could facilitate anti-climate change by shutting down these sorts of facilities. Active armed rebellion. If you look at the communique in particular, what is described in there is armed rebellion. His intent is to engage in these acts, to have other people also engaged in armed rebellion. And whether or not they would actually do that or whether or not they would just go and write a letter to their congressman, I believe that the most important thing is not so much what happened or who did what vis-a-vis the civilian population. It was what was his intent. And that intent can't be taken in a vacuum. It has to be looked at in a totality of the circumstances. And the district court had a reasonable inference to make to say he did this not once but twice. Both times he left spray paint of an environmental activist group. Not only did he try to hide himself and not be caught, he decided to act upon a communique that directly outlined how to take down power stations, how to start an armed rebellion against, you know, fossil fuels. And all of those things together have links in a chain to show that his intent was not to have the people just write to their congressman. It was have more individuals rise up and have armed rebellion. But how does that amount to intimidating or coercing those people as opposed to just trying to stimulate them to do what he's doing? That comes down to, is it intimidating to write a letter? No. Is it intimidating to use a high-powered rifle multiple times? If this rifle was not just a normal pistol or a . . . I understand how that would intimidate the energy company. But you're arguing it would intimidate other people in the population . . . Yes. . . . as well as that they would then also shoot electrical equipment or . . . I think . . . . . . somehow rise up against electrical companies. I think that's his intent, whether or not they would do that. I think if you look at the record, his intent is to make them afraid to use power or to be in fear so that they change their ways, so they don't use carbon energy. He would have them . . . I don't see that here. In that sense, the location of the crime and the isolation seems to matter here. I think it's a fact that the Court should take into consideration. But I think the Court should also take into consideration that he wanted this publicized. He wanted it to be known that he was shooting, you know, 20 times. What's our standard review on this issue? The . . . it's a . . . for a departure provision, it is a abuse of discretion. That is the . . . whether or not the district . . . the findings of law are de novo. It's an abuse of discretion, and then I believe it's clear error of facts. But the standard for whether or not a departure applies to district court, it's whether he abused his discretion. And I think if you look at the discretion, the judge very much identifies why he made this decision. And ultimately, this is an area where had he looked at the facts as two separate instances, even without applying the enhancement, the 3A1.404, you have these two facts that are separated in time that shows that an individual needs to be deterred. He's not done this once. He's done this twice. The Court might be thinking, I need to stop him, deter him specifically, and deter others who may or may not be thinking to do the same thing, and to provide just punishment. And so even though the United States did not recommend consecutive sentences, the district court is not bound by the United States recommendation. And this is not a situation, again, where there was a wink and a nod. The district court is a separate body of government from the United States Attorney's Office, and we made the bargain that we did in good faith, and we honored that  But to look at the facts in this case are extremely — As far as winking and nodding goes, what about this sentence from the transcript? The defendant did this twice, separated by 10 months, Your Honor, two separate criminal acts of conduct. And we're asking the Court to impose really one sentence, a concurrent sentence for both, but that's a factor the Court consider in 3553A to determine the appropriateness of the level of the sentence. What does that mean? But that's a factor the Court can consider in 3553A.  I believe it's going to deterrence. And I would say that in terms of the decision that this Court should look at, it's the Cotier case, the Cotier, Cotier, C-O-T-T-I-E-R. In that case, the defense had raised an argument that the United States Attorney's Office had breached a plea agreement by arguing at a higher guideline range than was actually when the PSR came back. And the United States was firmly, in that case, stating that this is the bargain. We're going to go do what we said. And this Court had identified that there is no authority to say that anything prior to the sentencing would be a factor in determining whether or not there's a breach of the plea agreement. It's what happens at sentencing. And that — and that statement is important for what happens at sentencing, because this is a situation where we're asking, I believe, for the high end of the 151 to 188, and I apologize, it might have been the low end, but we were asking for the — within the guideline range. And we were asking the Court to apply that because the defense was arguing for much lower. I believe they were asking for the 41 to 51 month. They were asking for the original guideline range because they were opposing the note enhancement. And so this isn't a situation where the United States is saying, let's apply, in us, a consecutive sentence to get us to the full enhancement. This is a situation where the United States is honoring the plea agreement by saying, apply the facts of this case to the 3553A factors because they support that particular guideline range, that 151 to 188 months. And — but that does not mean that the district court is wrong in giving consecutive sentences. And I would also just note that, as the Court had asked before I ran out of time, that because the note 4 had been taken away on November 1st, that if there was ever a remand under 18 U.S.C. 3742G1, the district court would be bound by the application note 4. So this note wouldn't go away on remand. But pending your questions, that is all I have, Your Honors. Very well. Thank you for your argument. We'll hear Roboto. Thank you, Your Honor. The United States of America is breaching the plea agreement again by arguing that consecutive sentences today are appropriate when clearly the plea agreement was for concurrent sentences. I want to talk a little bit about this manifesto, as Mr. O'Connick put it. This was on a computer back in his apartment in Oregon based upon a search warrant, which we argued throughout the brief is invalid. And I'm hoping to have a little bit of time to talk about that. But their own expert could not even identify who wrote the manifesto or if it was even read. It was on my client's computer. And they attribute that as if he was the author of it and as if he subscribed to all of its point of views, which he clearly does not. There's no evidence that he authored it. And the United States just argued as if that's a very significant fact. Well, on my computer right now, I have hundreds of cases regarding domestic terrorism. That doesn't make me a domestic terrorist. With respect to, there was absolutely no employees present at either location. With respect to that computer search, that should all be excluded because of the illegal search that took place on May 13th of 2023. With respect to, this Honda was over a mile away from the electrical substation near Wheelock, North Dakota, Epping, Wheelock, North Dakota. It had rained for three days. Four hours after law enforcement initially get there, they look in binoculars and see this Honda. They go, and it's on the section line, it's on public section line. And it appeared to be stuck in the mud. And there was nothing in plain view inside that Honda, and it was locked. They bust into the Honda. No warrant, no nothing. They bust into the Honda. Inside the Honda, they find an owner's manual for a Bushmaster rifle, and they had found Bushmaster rounds right at the fence of the electrical substation, receipts for Bushmaster rounds, and a pill bottle containing Cameron Smith's name. This was all gained completely illegally. After they find this information, the deputy then says, oh, we better stop and get a warrant. And so they stop and get a warrant. And then they also decide they're going to tow the vehicle. Well, it's on a public right-of-way. There's no grounds to tow it, and the United States of America has admitted this. The United States of America has admitted it's an illegal search of the Honda. All evidence from the Honda must be suppressed. That's where they got Cameron Smith's name was from the illegal search of the Honda. And then when they try to illegally tow it, they call one tow company that says, I don't have a piece of equipment large enough. I'll refer you to a different tow company. And just out of coincidence, that tow company had given Cameron Smith a ride to the micro-tow. But he didn't know the name at that time. He just said, yeah, I'll come and tow. I'd given a guy a ride to the micro-tow. So law enforcement goes to the micro-tow because they legally got the name of Cameron Smith from the vehicle. And then just out of coincidence, because they were going to conduct an illegal tow, they know where Cameron Smith might be. By the time Richard had gotten to the place where Cameron was stuck, his vehicle was stuck, then he had Cam's name from a communication on his cell phone. So we've argued this extensively in our brief. I see my time is up. Very well. Thank you for your argument. Thank you. The case is submitted and the court will file a decision in due course.